Number 191233, Keisuke Suzuki v. Abiomed, Inc. May it please the Court, William Harrington for the plaintiff and appellant, Keisuke Suzuki. I would ask to reserve two minutes at the end of my argument. Yes, you may. This case, there is only one claim my client has brought here at the Senate Judgment Stage, and that is a breach of an implied covenant of good faith and fair dealing. And it is our position that there is ample evidence that was submitted in response to summary judgment to show that he was terminated based on the motive that Abiomed did not want to pay him his bargain for incentives, his equity incentives. And this resulted in a loss of identifiable, reasonably anticipated future compensation based on past services. And, you know, that's it. It's a fairly simple case with respect to... Okay, so the response is fairly simple, too. The guidelines were clear in order to get the second and third awards of stock. He had to meet certain performance goals, one of which was approval by the Japanese authorities. He had actually bargained to try to get some time reference, within which he had to have continued to be employed within a certain time period of that approval, and the company rejected it. And he was well aware that he needed to perform these things before he was terminated. That's the response. I understand that response. Okay, so what's your response to that response? My response is he was hired in 2010, salary plus some incentives. The incentive was if Japan makes the approval, you get 10,000 shares. So with respect to the prior signing, first of all, it's not relevant because there is an integration clause. But even if it were, it demonstrates that he was concerned. I think they even show this, that if there were new management in the company, he was concerned that they would try to harm him by terminating him when it became clear that approval was on the horizon. That was his concern, and that underscores the importance of the implied covenant because he has a reasonable expectation that he can expect, you're going to proceed in good faith in this contract. Fifteen months later, and what was it, six? I've forgotten how many additional submissions the company had to make to the Japanese authorities. Joe Castro ignores, I think, one very important thing. At the time in May 2014, they're trying to get this meeting with the Japanese authorities. My client, you can look at the evidence, is the primary person who arranges that. It's a very extraordinary meeting. I'm sorry. Okay. I'm sorry. Getting a meeting was not the goal. It may have advanced the cause a little bit, but it didn't get you past the goal line. I understand. It took 14 more months. At this point, the application was called the version C-12. Alibaba didn't make that version anymore. So if it was approved, they would then have to turn around and have a new application to amend. As of March, April, they got word that the Japanese authorities were going to request, and they can't change that provision. The Japanese authorities would need to invite, you need to update it. That was a very favorable occurrence, that they were going to invite them to change the application to the current version from C-12 to C-16. However, because it was from C-12 to C-16, it was necessary to update the reports. So there wasn't going to be approval in June 2015, but they indicated that meeting. We are prepared to approve once you submit the updated reports. This was regarded as a good development. So it's an unusual situation where at the time they terminate him, the development of this application has gone up. Now they are saying we're prepared to approve, but just update the reports. Well, approve is not going to be overnight. What is the motive when they decide to say, you've been working for five years, change the contract, give up or greatly reduce your incentive, your stock incentives? The motive was they didn't want to pay him. The CEO... Can I ask you, just so I get the legal landscape right, because as I read the cases, at least I have to say that maybe you've discovered the same thing. It's not entirely clear what this Fortune Grant doctrines, contents are, at least to me. But as I read the opinions, Fortune and Grant, if I look only at them, seem to distinguish between two different scenarios. One scenario is when the employer terminates for reasons of ensuring that the bonus is not paid. Yes. And another scenario is the employer terminates for no reason at all, or a reason that's not good enough. Yes. And those seem to be distinct scenarios laid out in those cases. Fortune seems to involve the first type of case. Grant seems to conclude it does not involve that first type of case. Instead, it's a case in which there was simply no reason for the termination. I agree with you. In fact, I'm a little confused by that, because Grant seems like it has not been followed as much. And it would seem to me, this is my reading of it, is that Grant, there is no bad faith in terminating, but the measure of damages is broader. What I can't tell is what is the measure of damages in the true bad faith case of Fortune. Fortune, they stipulate it as the damages. So they never have to talk about that. And the only other case I can find that really is a case where it's sort of clear that the jury has found or could find that the motivation of the employer in terminating was to deprive the person of the incentive payment or the bonus is arguably Cataldo. And that's a case that's very federal to me. The reason I ask it is if that's right, it seems to me one could read the Massachusetts president as suggesting that the relatively strict test that Grant develops and has been developed afterwards about how close you have to be to the vesting event in order to be able to recover might be different from how close you have to be in a case of a true bad faith termination where they just take away the bonus in order to deprive you of the bonus, which I think would be favorable to you. But I can't tell. My understanding, and I could be wrong, Your Honor, is that Fortune is the on-the-brink language, the Fortune analysis. Well, in Fortune they say that that is the evidence of the bad faith. But I don't read it to say that in a case in which you prove bad faith, you must be on-the-brink. I agree. But you have independent evidence different from on-the-brink of the bad motivation. Yes, I do. So to me, I don't see why then the on-the-brink has anything to do with it if we're in a case in which there's bad faith motivation. Maybe it's just the test from Cataldo of, you know, is this more than a hope? And then we just do a damages calculation. I agree. I agree, Your Honor. But if I could go back. And some of us are dubious about reading Massachusetts SJC opinions. What case law do you have to support that view? Harrington, I think that's the name of the case, the case that discusses Cataldo Harrison. Thank you. Okay, if I could address that. First, fortune. I think the heart of the fortune situation is an at-will employee, or maybe it's a manufacturer's rep, but it's an at-will relationship, where if you show on-the-brink, the court deems the whole transaction as being fulfilled. That is what we're getting at. And I think the court needs to consider in the at-will context that the courts are trying to define the narrow contours of this very limited exception to the at-will rule. Some of us don't think your at-will distinction has much to do with anything and that the rules really straddle both the contractual, quasi-contractual, at-will. I understand, Your Honor. It doesn't help me for you to revert to at-will. And it doesn't help you to emphasize on-the-brink. It does not help me. I agree. But with respect to on-the-brink, it's not necessary to show on-the-brink. On-the-brink will get the plaintiff the full transaction. If I were to show, at trial, on-the-brink, I'm entitled to 20,000 shares. But I don't need to show on-the-brink. I just need to show, and Harris has a case where it says, a termination of bad faith, a loss of compensation that is clearly connected to work already performed. The whole goal of the implied covenant is to avoid a windfall. This is a huge windfall. There's no one else who got any stocks from this. This is 20,000 shares. Your argument is, because there is at least a jury issue on the question of bad faith, I can then pursue a bad faith claim, and I can get some measure of damages, which might be less than the full stock. And it is commensurate to what value I gave the company toward achieving the regulatory approval, which came along 14 months later. Exactly. Exactly. Before you leave that point, did you make that argument to Judge Casper on the district court? I believe I did. With respect to proportional recovery, I did. You did not? With respect to proportional recovery? Oh, I think I did. I'm sorry. I did make that argument. I made it in the complaint as well. And she said that Massachusetts law really doesn't allow for this proportional recovery. Either you performed enough on the brink and you get it all, or the terms of the deal are you don't get it. Well, my reading of Judge Casper's decision is she doesn't really address that issue, but she sets forth a standard as you need to be on the brink of achieving the full situation. And you're saying, no, you don't, as long as you have evidence of malice. Malice is substantial work toward the goal. Yeah. Okay. But there's malice, there's bad faith. Bad faith. Sorry. I do think if we did prove on the brink, we would be entitled to $20,000 not proportioned. But just so I'm clear on this point, is your claim the same? What do you mean by bad faith? The cases are somewhat unclear. You start off by saying that the motive here that you can show is that the reason for the termination was to deprive him of the bonus. Yes. Okay. That I totally understand, and then I understand the rest of your argument. Are you saying it's the same answer, even if you can't show that, and all you can show is that you don't know why they did it and they didn't have a good cause for termination? I think bad faith in this context is they were trying to deprive him, and then they basically said, we don't like this contract. We want to renegotiate if you don't refine it. So you're fine if that's all you could bring to the jury is that argument? Well, I get it. I am totally happy to show liability and damages. Damages are the fair value of the services at the time of the termination toward this approval. But predicated on a finding by the jury that the motive for the termination was to deprive him of the bonus. Yes. But there's also an argument of underleveraging to try to extract better terms, which I think are the same. Okay. I see my time is up. Okay. Good morning, Your Honors. Ken Bellow along with my colleague, Alexandra Thaler-Ferrariumi. Let me address right up front the distinction that's been made. First, to your point, Judges, this court has said on at least two occasions that it's not up to the federal courts to expand Massachusetts law. It said that in the Sargent case. It said that in Bonneville- Oh, we've said it many more times than twice. Those are the two I asked. And the fact is there is a pretty clear delineation in cases. It's interesting how few cases have got to the appellate court level over the last ten years. But that said, fortune is pretty clear. You have to be on the brink. Fortune is clear that you do not have to be on the brink. Fortune is clear that the evidence of being on the brink is evidence that the reason for the termination was to take the bonus. I agree. So suppose we had a case in which the employer says, I know I promised you 10,000 shares of stock. But my God, that stock is worth a ton now. I'm taking it all. And I'm terminating you unless you agree that I can reduce it by 80%. And we're five years into the work with another two years to go. Under fortune, that's fine? First of all, that's not our facts. I know that. So the answer is not an answer to my question. And I'll answer your question. Potentially not fine. Well, if it's not fine, then that means it doesn't have to be on the brink. No, I'm back to it. This is exactly the case that says it has to be on the brink. If there's another two years of work. I thought fortune said you had to have already earned the compensation. And the fact that the payment would be made after you had earned it does not excuse the employer. By definition, if it's going to take two more years, you're not on the brink. In this case, you are. You're just not focusing on my question. Go ahead. There's two issues. The first issue is motive for termination. Okay. Good cause. The answer is good cause. Very liberally in favor of employers. Fortune makes clear that if the reason for the termination is to take the bonus, that's bad faith. Correct? It's evidence of bad faith. I don't think it says that that without more is bad faith. So in this case, Your Honor, there's not a single fact in this record, not one iota, that the actual motive, other than... Well, I'd say if you're right about that, then there's no reason to take it to the jury. There is no reason to take it to the jury. But I'm asking, you seem to be arguing in your brief that even if there was a fact that a jury could find that the reason for the termination was to take the bonus, you'd still win. I don't think that's really what we argue, Your Honor. I'm saying that on the brink is required. It's an absolute requirement. You can't, and the fact is, so let's assume... That that means then, in a case in which an employer has an employee, and the employee has been promised 10,000 shares of stock, and he's three years into working on it, and now the stock is worth a ton, the employer can say, well, now that the stock's worth so much, I'm taking it all. Well, if you have an agreement with the employer, then a lot... No, Your Honor, but the agreement... Yeah, you're saying that's fine. Your case is made very clear. You can't, the covenant is not to rewrite an agreement. This is not devoid of an underlying document, and the underlying document clearly says you have to be there when it's approved. We have the right... The underlying document... Isn't there, isn't the way to reconcile this apparent tension to say that, yes, the motive to fire to take the bonus can be bad faith, but in order to find that the motive was to take the bonus, there has to, at that point, be some legitimate expectation that the bonus is going to be errant, which means that you've got to be somewhere fairly close to the point where the bonus comes into play. You can't be 5% of the way down the road with the bonus. And frankly, you can't be 70% or 80%. Well, that's the key thing, that's the key point, because Cataldo's language is it can't be just a hope or a prophecy, it's got to be on the horizon. And 70% of the way down the road, maybe that is on the horizon. In Cataldo, which has been critiqued multiple times, fundamentally, at the end of the day, there was an agreement. The person already had the interest. That's not how Harrison describes it. Well, I suggest to you that there are other cases that describe Cataldo. But Harrison's an SJC opinion. I don't, with due respect, Cataldo is actually distinguished in Harrison. But not on the ground that it was a contract. They treat it as a fortune grant case. I understand they recognize it, but I don't think Harrison says, first of all, I don't think there's any case, not one, that has recognized proportional payments. Zero. I don't think there's a single case that gets you there. And for this court to take that, that would be a radical extension of fortune, of grant. So to go back to Judge Sully's question, in this case, first of all, it's... Well, Cataldo did proportionate, didn't it? But Cataldo did proportionate because of the underlying agreement. The underlying agreement. The plaintiff in Cataldo had an equity interest already vested at the time. Well, it was in a future project. But it didn't matter. He got ownership on day one. Yeah, he got ownership on day one. He got ownership on day one. I give you ownership. Okay? I actually have an agreement to get back your ownership. But Cataldo was decided not as a contract case. Well, that's not entirely clear with due respect, Your Honor. I think if you read Cataldo, it's sort of like reading some biblical passage. You can find anything you want in it. We'll strive to decide this case differently. It is very... Well, one way we could do it was by certifying the question to the court. I don't think there's anything to certify here, Your Honor. I think this is so far beyond anything that the SJC or the appeals court have decided on virtually every aspect of this case, Your Honor. Granted, Judge Casper did not reach good cause. You have plenary authority to look at this. This record is so replete with an absence of bad faith. Unless that faith is... You know, I understand your argument. But the fact of the matter is he was told the reason you're being terminated is you won't agree to our second proposed revision of your deal under which you would not receive anything like the number of shares of stock. In Barsanian and Bewald boasting for the proposition that for an admiral employee, you can tell an employee that the agreement going forward is going to be different as long as it's not for otherwise an illicit motive. Otherwise an illicit motive? Right. But there is not a single thing... Okay. As a matter of law, you're saying unless it's on the brink, an employer's insistence that you change the terms of the compensation cannot be bad faith? I could come up with a hypothetical, but I don't think you can do it here, Your Honor. You have an agreement that first of all says... Well, if you could come up with a hypothetical, give me the hypothetical that you could come up with. That an employer... Okay. I've got an agreement. The other cases where I actually have an agreement that gives me something. Okay? You have it. But often agree... I don't want to change... Are you saying it has to be on the brink unless the contract says it? I think they're related but separate concepts, Your Honor. I don't think the two mesh the way you're meshing them in the question. I think in this case, what you have, and there's a timing part, which I'm assuming is pretty clear. The suggestion by Your Honor Judge Lynch is, remember, I'm interested in the record is that the timing of deciding that it's five years into this. By the way, I keep hearing five years of work. It's tomorrow and tomorrow and tomorrow. The record is replete with it's going to be 12 to 24 months from 2011. We're now in 2015. So this five years of work is kind of a red herring in the reality of the facts of this case. So you have a scenario of events that are all in the record that ultimately in May, before this great meeting with the PMBA in June, no mas. We need to change. We're going to change the arrangement. Now, they certainly could have, Judge Lynch. They didn't need to ask his permission. They simply have the right, the language in the agreement says, we have the right to change the compensation package. Or it might have helped if they had said, look, we have complaints about your irascibility. We have complaints that you've lined up doctors to put pressure on this Japanese agency and they don't like it. And when we put it all together with the lack of progress, we need to change your status. You've added sort of reasons. No, that's not it. I don't think that's fair, Your Honor. The record is replete. In April, he gets his review. Yeah, fair enough. Which he says, this isn't this typical case where- He gets a one, which is as low as you can get. He makes himself a one. He says, bottom line, I didn't get approval. He says, not just to have you, Meg, you have multiple- So you say that alone would justify a change in the terms and conditions of his employment? Well, I think they have the right legally and under his agreement to do it. But, yes, that alone would reflect good cause coupled with everything that's in this record going back to 2013 in terms of the progression of the project, getting to go, getting to the goal line of approval, coupled with caustic and irascible conduct, coupled with, in September 2014, the CEO saying, we're going to make a change, coupled with, in January of 2015, he comes. Mr. Suzuki says, PMDA thinks I'm a liar, thinks that I'm not candid. Imagine if I went to a client and said, you know, the judge in this case really doesn't like me. It's not fear, but they don't have any confidence in me. And the client says, you know what, I'm going to change lawyers. So there was not just a little bit of good cause or an absence of bad faith, there's overwhelming basis for them to proceed forward and separate. First to say, we're going to change the deal, here's the deal, going forward, if you want to stay. Now, interestingly enough, on June 3, before this meeting, Andrew Greenfield, it's in the record, sends an email, says, look, I don't think he's going to accept it, we'll have to proceed forward with termination. So to say it was just because, one flow from the next, the real reason, obviously, for the termination, in the end, was the failure to move towards getting approval, the caustic conduct, the comments, the irascibility, the lack of confidence with PMDA. From the perspective of Cataldo, because your Honor, Judge Barron reflected that, it is, at the end of the day, a different case. It is a case that starts, first and foremost, with an agreement of a vested interest. And then they try to change the deal. That fits much more in the generalized implied covenant having to do with Anthony's and the like. So whatever paradigm you use, in this case, his agreement was what it was, which is he did not have. These things had to occur. And at the end of the day, if you really come down to the simplicity of the case, what Mr. Suzuki asked this court to do is to say that a jury, after the fact, can rewrite an agreement, can rewrite it either to give the whole or proportional. When an individual is terminated, clearly not on the brink, I don't know how he could get there, but even Graham reflects services clearly reflective of the past services. So even in Graham, there's a link. Judge Casper, at oral argument, asked me, how much time? A little bit similar. Where's the line? And I reflected candidly, I don't have a line, but what I can tell you is there's not a single case out there, not one that remotely cuts. It wasn't fought too much. It was 15 months from June of 2015 to September of 2016 with all the events that occurred in between. And these were not trivial events. Contrary to what is reflected, the record is deep with all the things that had to occur and substantial doubt, even by Mr. Suzuki. As a time is being terminated, he's saying, I don't know if we're going to get it. They may take our toys and go home. We may not get approval. They have to have tests that go well. They have to have the submissions that go well. As anybody who sort of lives in this world, companies spend tens of millions of dollars. Just so I maybe make it easy, take all the facts of the case are the same except for one. Yes, sir. The employer says to Suzuki, I just saw how much the value of your stock is because of all the work you've been doing. The company seems to be doing great because they hear that we're going to get this approval. I know it's a ways away. But in light of how much your stock is worth, we're taking it all. Is there a fortune claim at that point? I can't answer the question in a vacuum. I think if you're not on the brink, I don't think there is a fortune claim. So that's fine for an employer to do that? I don't take it. The only thing that's fine is that legally, does it cross the line legally? Is it fair? But lots of cases say, look, employers don't have to be fair. They don't have to be nice. It's not a question of even being arbitrary. It has to be across that line.  Well, I don't think the SJC will. I think that all the pronouncement of the appeals court will. It depends what decade you're talking about. But at this juncture, we have multiple appeals courts' opinions that have clearly not taken the leap to take that any further. Thank you, Your Honor. I appreciate your listening. Thank you. Your Honor. Just briefly, with respect to Cataldo, I think there was some talk about it being vested shares. I think the opinion makes clear it was unvested shares. I know it mentions it once. I think it mentions it more than one time. But I just want to briefly address this whole situation about my client supposedly having a bad relationship with PMDA. He didn't. He had a bad relationship with the reviewer. And he only had a bad relationship with the reviewer because he was going over the top of the reviewer's head and talking with influential people within PMDA and influential positions. He was doing that because that was the agreed-upon strategy of Aviomail. I have submitted numerous e-mails. After this January 2015 meeting where supposedly they're shocked by this good cop, bad cop situation, it is clear that my client's affidavits that that was the agreed-upon strategy is accurate because there's numerous e-mails where he's meeting with people in Japan and reporting back to Mr. Greenfield saying I met with this influential person. They say it's going to be approved. He is meeting up through at least many of the people in Japan, influential people with the president of PMDA. I don't know if he met with them directly or some of them contacted him. But he's relaying very favorable information. He is the one that got this very favorable meeting. So to say that he has a bad relationship, he was fined for that, that is simply not true. And in May, they know the meeting is coming up. They give him this negative review. But they say starting fiscal year 2016, which is July 1,  he is still going to be the person in charge of trying to get approval. They're taking away his other duties. But he's still the lead person looking for approval. But they're taking away his incentive for the approval. That is evidence of bad faith. And I'll just rest on my brief if there's no other questions. Thank you both. Well argued on both sides. Interesting case.